**United States District Court**
For the Northern District of California

1
2
3
4
5          UNITED STATES DISTRICT COURT

6          NORTHERN DISTRICT OF CALIFORNIA

7

8   MICHELLE FANUCCI,                           No. C-08-2151 EMC

9          Plaintiff,

10      v.                                        **ORDER GRANTING IN PART AND
                                                  DENYING IN PART DEFENDANT'S**
11  ALLSTATE INSURANCE COMPANY,                  **MOTION FOR SUMMARY JUDGMENT
                                                  OR PARTIAL SUMMARY JUDGMENT**
12         Defendant.
    _____/            **(Docket No. 48)**
13

14

15         Plaintiff Michelle Fanucci has filed suit against Defendant Allstate Insurance Company,

16  asserting claims for breach of contract, negligence, and negligent misrepresentation.[1]  Currently

17  pending before the Court is Allstate's motion for summary judgment or partial summary judgment.

18  Having considered the parties' briefs and accompanying submissions, as well as the oral argument

19  of counsel, the Court hereby **GRANTS** in part and **DENIES** in part the motion.

20                    **I.    FACTUAL & PROCEDURAL BACKGROUND**

21         In January 1997, Ms. Fanucci – at the time, only thirteen years old – was hit by a car driven

22  by an underinsured motorist.  Because the motorist was underinsured (*i.e.*, Ms. Fanucci's damages

23  exceeded the motorist's auto policy), her parents submitted an uninsured motorist ("UIM") claim to

24  Allstate to make up the difference.  Allstate contends that the Fanuccis only had UIM coverage

25  under the auto policy they had with Allstate; in other words, Allstate only had to pay up to the auto

26

27  _____

28         [1] Originally, Ms. Fanucci sued not only Allstate but also Michael B. Baldwin, Allstate's agent
    who sold an auto policy and an umbrella policy to Ms. Fanucci's parents.  Ms. Fanucci voluntarily
    dismissed her claims against Ms. Baldwin in June 2008.  *See* Docket No. 15 (order, filed on 6/6/2008).

**United States District Court**

For the Northern District of California

1    policy limit.  Ms. Fanucci asserts that the Fanuccis' umbrella policy was supposed to provide for

2    excess UIM coverage – that is, Allstate had to pay up to auto policy limit, *plus* the umbrella policy

3    limit.  Resolution of this dispute turns on what took place when the Fancuccis purchased the auto

4    and umbrella policies from Allstate.

5         It is undisputed that the Fanuccis obtained the auto policy, which included UIM coverage,

6    back in 1987.  The parties dispute, however, when the Fanuccis obtained the umbrella policy.  Ms.

7    Fanucci contends that her parents obtained – or at least tried to obtain – the umbrella policy at the

8    same time that they obtained the auto policy, *i.e.*, back in 1987.  *See* Robert Fanucci Depo. at 55-58,

9    61.  Allstate's position is that there was no umbrella policy in place until 1993.[2]  *See* Sisson Decl. ¶

10   4; Robert Fanucci Depo., Ex. A (umbrella insurance application).  In the end, the parties' dispute as

11   to when the umbrella policy was obtained is not dispositive, at least for purposes of the pending

12   motion, because both parties agree that, at the time of Ms. Fanucci's accident in January 1997, the

13   umbrella policy was in place.

14        As to the umbrella policy that was in place at the time of the accident, the parties agree that,

15   by its terms, it did not provide for coverage above the UIM limits.  The policy covered only third-

16   party claims for liability, not first-party claims for UIM coverage.  *See* Davis Decl., Ex. A

17   (declarations page and umbrella policy).  In spite of this fact, Ms. Fanucci claims that Allstate is

18   liable up to the coverage limit of the umbrella policy in excess of her UIM claim because Allstate's

19   agent, Mr. Baldwin, made representations on which her father, Robert Fanucci, relied.  More

20   specifically, Ms. Fanucci asserts that, back in 1987, Mr. Baldwin represented to her father that the

21   umbrella policy would provide not only coverage with respect to third-party claims for liability but

22   also UIM coverage.[3]  Allstate disputes this.

23        Ms. Fanucci's accident took place in January 1997.  It appears that, soon after the accident,

24   Ms. Fanucci's father contacted Mr. Baldwin, and Mr. Baldwin "indicated that nothing further

25   needed to be done at that time under [the Fanuccis'] insurance policy."  Robert Fanucci Depo., Ex. C

---

27   [2] Allstate provides uncontradicted evidence that no umbrella policy was actually issued until 1993.

28   [3] Ms. Fanucci asserts only that representations made in 1987, not 1993, as the basis of her claim.

(letter, dated 2/11/1998, from Robert Fanucci to Mr. Baldwin).  Robert Fanucci contacted Mr.

Baldwin again in February 1998.  In a letter dated February 1, 1998, Mr. Fanucci noted:

> At this time, we are not aware of the amount of insurance that the driver of the vehicle may have.  In the event that Michelle's injuries exceed the policy limits of the driver's insurance, it is my understanding that the uninsured motorist provisions of our automobile insurance would be applicable to cover any deficiency.

Robert Fanucci Depo., Ex. C (letter, dated 2/11/1998, from Robert Fanucci to Mr. Baldwin).

Some three years later – on or about March 7, 2001 – the Fanuccis had their lawyer, Peter

Hinton of the Hinton & Alfert law firm, contact Mr. Baldwin once again.  In the letter, Mr. Hinton

noted that the Fanuccis had obtained "the $100,000 limits of liability coverage of Lucille Meyer, the

driver who struck [Ms. Fanucci]."  Hinton Depo., Ex. 1 (letter, dated 3/7/2001, from Mr. Hinton to

Mr. Baldwin).  However, the $100,000 did not fully compensate Ms. Fanucci for her injuries and

damages and therefore the Fanuccis asked that "an underinsured claim be opened in this matter if

that did not occur at the time of [Robert] Fanucci's prior contacts."  Hinton Depo., Ex. 1 (letter,

dated 3/7/2001, from Mr. Hinton to Mr. Baldwin).  Implicitly acknowledging that the UIM claim

had to be arbitrated as required by statute, *see* Cal. Ins. Code § 11580.2(f),[4] Mr. Hinton concluded

the letter by stating that he was hopeful that the dispute could be resolved without the need to go to

arbitration.  *See* Hinton Depo., Ex. 1 (letter, dated 3/7/2001, from Mr. Hinton to Mr. Baldwin).

Subsequently, on or about May 7, 2001, Allstate's counsel, Mark Goodman of the Haskell &

Goodman law firm, sent a letter to Mr. Hinton.  His letter stated in relevant part:

> It is my understanding that your client, Michelle Fanucci, is making an underinsured motorist claim through her parents['] automobile insurance policy with Allstate.  It is also my understanding that the Fanucci[s'] auto policy has limits of $250,000 [per person]/$500,000 [per incident].

> In light of the fact that Ms. Fanucci has recently been paid the sum of $100,000 from [the underinsured motorist's] carrier, the policy limits in Ms. Fanucci's claim with Allstate have been reduced to $150,000.00.

---

[4] Section 11580.2(f) provides in relevant part that "[t]he policy or an endorsement [for uninsured or underinsured motorist coverage] added thereto shall provide that the determination as to whether the insured shall be legally entitled to recover damages, and if so entitled, the amount thereof, shall be made by agreement between the insured and the insurer or, in the event of disagreement, by arbitration."  Cal. Ins. Code § 11580.2(f).

1   Hinton Depo., Ex. 1 (letter, dated 5/7/2001, from Mr. Goodman to Mr. Hinton).

2          It appears that, thereafter, the parties entered into a mediation in the attempt to settle their

3   dispute.  On or about January 16, 2002, Mr. Hinton (the Fanuccis' counsel) sent a letter to Mr.

4   Goodman (Allstate's counsel), disputing a statement made by Allstate in its mediation brief – *i.e.*,

5   the statement that Ms. Fanucci had made a policy limits demand of $250,000.  Mr. Hinton stated that

6   this was not true – that the full policy limits under the Fanuccis' UIM coverage included the

7   umbrella limit.

8              In addition to the specific underinsured motorist coverage in the auto
            policy of $250,000, the Fanucci[s'] have an excess policy which
9           Allstate has acknowledged is applicable in the amount of $1,000,000.
            Therefore the "full policy limits available to [Ms. Fanucci] under the
10          Fanucci[s'] underinsured motorist coverage" is $1,250,000 less the
            $100,000 received from the driver of [t]he offending vehicle, or a net
11          of $1,150,000.

12  Hinton Depo., Ex. 1 (letter, dated 1/16/2002, from Mr. Hinton to Mr. Goodman).  This was the first

13  time that the Fanuccis expressly raised the assertion that the umbrella policy provided additional

14  UIM coverage.  But notably, that assertion said nothing about Mr. Baldwin's alleged representations

15  in 1987; the Fanuccis made no claim of misrepresentation or estoppel.

16         At the mediation which took place the next day (*i.e.*, on January 17, 2002), Allstate informed

17  the Fanuccis that the umbrella policy provided for excess insurance for liability to third parties only.

18  *See* Hovanec Depo., Ex. 4 (computer notes, dated 1/18/2002).  Several months later, on or about

19  March 5, 2002, Allstate's new counsel (also litigation counsel of record) provided the same

20  information to the Fanuccis.  Michael Barnes of the Sonnenschein law firm noted that Mr. Goodman

21  would "continue to represent Allstate on issues relating to the underinsured's liability and damages"

22  but that the Sonnenschein law firm would represent Allstate regarding the claim made pursuant to

23  the umbrella policy.  Hinton Depo., Ex. 1 (letter, dated 3/5/2002, from Mr. Barnes to Mr. Alfert).

24  Mr. Barnes stated:

25             Allstate's umbrella policy contains no UM or UIM coverage.
            Indeed, it is a liability policy, not a first-party auto policy.  This should
26          be obvious from the contract's language, which is in your clients'
            possession.  To my knowledge, there is no Allstate umbrella policy
27          that affords UM or UIM coverage.  If you would like to discuss the
            Fanuccis' umbrella policy, I would be happy to listen to your theories.
28          The UIM arbitration is not the place for such a discussion, however,

4

United States District Court

For the Northern District of California

and efforts to obtain information about Allstate's coverage through the
discovery process of the UIM proceeding will be resisted strenuously.

Hinton Depo., Ex. 1 (letter, dated 3/5/2002, from Mr. Barnes to Mr. Alfert).

The evidence of record does not reflect that Ms. Fanucci, her parents, or their counsel took issue with or ever responded to Mr. Barnes's letter. In fact, it was not until sometime in 2005 – after the parties proceeded to arbitration for the UIM claim and the arbitrator had issued his decision on the claim – that the Fanuccis alerted Allstate for the first time that it was their position that there was UIM coverage under the umbrella policy because Mr. Baldwin, Allstate's agent, had represented that there was such coverage when they purchased the policy.

Meanwhile, the UIM arbitration proceeded. *See* Hovanec Depo., Ex. 7 (computer notes, dated 10/3/2002) (indicating that in or about October 2002 Allstate made the decision to move the case into arbitration); Hovanec Depo., Ex. 9 (computer notes, dated 8/17/2004) (noting that arbitrator was selected). Importantly, as Ms. Fanucci conceded at the hearing, the Fanuccis did not raise during the arbitration the issue of UIM coverage under the umbrella policy. Instead, the arbitration focused on the extent of injury and whether it was causally related to the auto accident. On or about September 1, 2005, the arbitrator determined that Ms. Fanucci was entitled to more than $1.4 million in damages. More specifically, the arbitrator awarded Ms. Fanucci approximately $68,000 in special damages and $1.35 million in general damages. The arbitrator noted that "$1,350,000 is reasonable compensation for the shock, pain and fear [Ms. Fanucci] suffered during and immediately after the accident, for the pain and suffering suffered during the time of recuperation to date and for the next 60 years of future pain and suffering due to her mild to moderate permanent condition and residual injuries and deficits." Martin Decl., Ex. E (arbitrator's decision, dated 9/1/2005).

Allstate then filed with the arbitrator an application to correct the award, arguing that it only had to pay $150,000 under the auto policy. *See Fanucci v. Allstate Ins. Co.*, No. A115067, 2007 Cal. App. Unpub. LEXIS 10452, at *5 (Cal. Ct. App. Dec. 21, 2007). In its application, Allstate also argued that "'any issues concerning applicable amounts of insurance policy coverage applicable to claimant's loss which may be in dispute are not now and have never been before the Arbitrator for

United States District Court

For the Northern District of California

1   consideration and no evidence on these issues were presented during the arbitration hearing.'" *Id.* at

2   *6.  The arbitrator denied Allstate's application.  *See id.* at *6-7.

3          Thereafter, on November 16, 2005, Allstate filed in state court a petition for correction of the

4   award.  *See id.* at *7.  In response, the Fanuccis took the position that Allstate's request should be

5   denied because Allstate's agent, Mr. Baldwin, had told Robert Fanucci at the time that he purchased

6   the umbrella policy that it would include UIM coverage.  Robert Fanucci submitted a declaration to

7   this effect.  *See id.* at *8-9.  As noted above, this was the first time that Allstate was made aware of

8   the Fanuccis' claim that Mr. Baldwin had misrepresented the coverage available under the umbrella

9   policy.

10          Initially, the trial court refused to grant Allstate's request to limit the award to $150,000.

11   Instead, the court agreed with the Fanuccis and held that Allstate was estopped from denying UIM

12   coverage under the umbrella policy.  The trial court therefore reduced the arbitrator's award to only

13   $1,150,000 (in recognition of the $100,000 already paid by the underinsured motorist).  *See id.* at

14   *13-14.  Allstate then filed a motion to vacate the judgment and enter a different judgment.  The trial

15   court granted this second motion.  The court stated, in effect, that it had reconsidered its earlier

16   ruling and concluded that it had exceeded the extent of its authority to correct the award.  The court

17   noted that the arbitrator was deciding only whether Ms. Fanucci was entitled to recover against the

18   underinsured motorist and, if so, the amount of damages; the arbitrator was not deciding the amount

19   of coverage available for payment of the damages.  *See id.* at *14.  Accordingly, the trial court

20   granted Allstate's motion and entered a new judgment of $150,000.  The court specifically stated

21   that this ruling was without prejudice to the Fanuccis' right to file a declaratory relief to determine

22   coverage under the umbrella policy.  *See id.* at *15-16.

23          The Fanuccis appealed.  On appeal, the trial court's ruling was affirmed.  *See id.* at *32-33.

24   The appellate court explained that the lower court properly corrected the award, from $1.4 million to

25   $150,000, because "the arbitrator exceeded his powers by making an award in excess of the auto

26   policy limits for underinsured motorist coverage."  *Id.* at *23.  The arbitration was "limited to

27   damages and did not include the issue of insurance coverage under either the auto policy or any

28   other policy."  *Id.* at *22.  In other words, outside the scope of the arbitration was whether "the

6

United States District Court

For the Northern District of California

1   Fanuccis were entitled to underinsured motorist coverage under the excess policy on a theory of

2   promissory estoppel." *Id.*; *see also id.* at *30 (noting that "only the auto policy in this case was the

3   subject of arbitration and the Fanuccis never asserted in the arbitration proceedings that they were

4   entitled to uninsured motorist coverage under the Allstate excess policy").

5       Approximately three months later, on March 12, 2008, Ms. Fanucci initiated the instant

6   litigation.

7                                   **II.   DISCUSSION**

8   A.   Legal Standard

9       Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if

10  the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

11  affidavits, if any, show that there is no genuine issue as to any material fact and that the moving

12  party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  An issue of fact is genuine

13  only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.  *See*

14  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  "The mere existence of a scintilla of

15  evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for

16  the [ nonmoving party]." *Id.* at 252.  At the summary judgment stage, evidence must be viewed in

17  the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the

18  nonmovant's favor. *See id.* at 255.

19      Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion

20  for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to

21  establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*,

22  477 U.S. 317, 322 (1986).  But, if the defendant is moving for summary judgment based on an

23  affirmative defense for which it has the burden of proof, the defendant "must establish beyond

24  peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor."

25  *Martin v. Alamo Cmty. College Dist.*, 353 F.3d 409, 412 (5th Cir. 2003) (internal quotation marks

26  omitted; emphasis in original); *see also Clark v. Capital Credit & Collection Servs.*, 460 F.3d 1162,

27  1177 (9th Cir. 2006) (noting that a defendant bears the burden of proof at summary judgment with

28  respect to an affirmative defense).

B.      Statute of Limitations

In her complaint, Ms. Fanucci has asserted claims for declaratory relief, breach of contract, breach of the implied covenant of good faith and fair dealing, negligence, and negligent misrepresentation.  By stipulation, Ms. Fanucci withdrew her claim for breach of the implied covenant of good faith and fair dealing.  She also withdrew that part of her breach-of-contract claim that alleged bad faith.  *See* Martin Decl., Ex. F (stipulation).  Thus, at this juncture of the proceedings, the claims at issue are breach of contract, negligence, and negligent misrepresentation.  Allstate argues that each of these claims should be dismissed based on the statute of limitations.

A claim that a cause of action is barred by the statute of limitations is an affirmative defense.  *See Aerojet Gen. Corp. v. Superior Court*, 177 Cal. App. 3d 950, 953 (1986) (stating that "[t]he statute of limitations is an affirmative defense"); *see also Wyatt v. Terhune*, 315 F.3d 1108, 1117-18 (9th Cir. 2003) (noting that "it is well-settled that statutes of limitations are affirmative defenses, not pleading requirements.").  As noted above, a defendant moving for summary judgment based on an affirmative defense "must establish beyond peradventure *all* of the essential elements of the  . . . defense to warrant judgment in [its] favor."  *Martin*, 353 F.3d at 412 (emphasis in original).

1.      Accrual

In its motion, Allstate asserts that the breach-of-contract and negligence claims accrued by 1987 (*i.e.*, when the Fanuccis purchased the auto policy), 1993 (*i.e.*, when, under Allstate's version of the facts, the Fanuccis purchased the umbrella policy), or 2002 at the latest (*i.e.*, when Robert Fanucci asserted in a letter to his own attorney that Mr. Baldwin was grossly negligent).  Each of the claims has a statute of limitations that is four years or fewer.[5]  Thus, according to Allstate, Ms.

---

[5] A claim for breach of contract has a four-year statute of limitations.  *See* Cal. Code Civ. Proc. § 337 (providing that "[a]n action upon any contract . . . founded upon an instrument in writing" must be commenced "[w]ithin four years").

A negligence claim as pled in the instant case – *i.e.*, a claim for professional negligence – has a two-year statute of limitations.  *See Hydro-Mill Co., Inc. v. Hayward, Tilton & Rolapp Ins. Associates, Inc.*, 115 Cal. App. 4th 1145, 1154 (2004) (stating that plaintiff's "negligence claim [which] alleges that Hayward, a broker, did not obtain the insurance coverage requested . . . and falsely represented . . . that the proper coverage had been obtained" is a claim for professional negligence and therefore "is governed by the two-year statute of limitations set forth in section 339, subdivision 1 of the Code of Civil Procedure"); *Slavin v. Trout*, 18 Cal. App. 4th 1536, 1539 (1993) (noting that California Code of Civil Procedure § 339, which "refers to an action on an obligation or liability not founded upon an

United States District Court
For the Northern District of California

1   Fanucci should have filed suit by 2006 at the latest. Ms. Fanucci, however, did not initiate the

2   instant lawsuit until March 12, 2008. *See* Docket No. 1 (complaint, originally filed in state court).

3          The Court rejects Allstate's contention that the claims accrued by 1987 or 1993. "Generally

4   speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its

5   elements.'" *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005). There is, of course, an

6   exception to this general rule. Under the "discovery rule," accrual of a cause of action is postponed

7   "until the plaintiff discovers, or has reason to discover, the cause of action. [¶] A plaintiff has reason

8   to discover a cause of action when he or she 'has reason at least to suspect a factual basis for its

9   elements.'" *Id.* at 807. The California Supreme Court has explained that,

10              [i]n so using the term "elements," we do not take a hypertechnical
                approach to the application of the discovery rule. Rather than
11              examining whether the plaintiffs suspect facts supporting each specific
                legal element of a particular cause of action, we look to whether the
12              plaintiffs have reason to at least suspect that a type of wrongdoing has
                injured them.
13

14   *Id.*

15          In the instant case, the claims could not have accrued by 1987 or 1993 because, even though

16   the alleged wrongdoing had taken place by that point (*i.e.*, an umbrella policy providing for

17   additional UIM coverage had not been issued contrary to alleged representation of Allstate's agent),

18   all of the elements of the claims for breach of contract and negligence claims were not yet complete

19   – *i.e.*, Ms. Fanucci had not yet sustained any injury or damage. The accident did not take place until

20   _____

21   instrument of writing[,] . . . is commonly applied to negligence by professionals which damages
     intangible property interests").
22

23          A negligent misrepresentation claim has either a two- or three-year statute of limitations.
     *Compare Ventura County Nat'l Bank v. Macker*, 49 Cal. App. 4th 1528, 1530-31 (1996) (rejecting
24   plaintiff's argument that claim for negligent misrepresentation had a statute of limitations of three years;
     agreeing with defendants that "the essence of this cause of action is negligence, not fraud"), *with*
25   *Merchants Fire Ass. Corp. of N.Y. v. Retail Credit Co., Inc.*, 206 Cal. App. 2d 55, 61-62 (1962)
     (concluding that claim for negligent misrepresentation had a three-year statute of limitations).
26   Defendants indicate in their motion that they believe the negligent misrepresentation claim as pled by
     Plaintiff to have a three-year statute of limitations. *See* Mot. at 8 (noting that, under California Code
27   of Civil Procedure § 338(d), an action for relief on the ground of fraud or mistake, has a three-year
     statute of limitations). Ms. Fanucci's complaint does include allegations of deceit, *see* Compl. ¶ 44
28   (alleging that "[Mr.] BALDWIN had no reasonable grounds for believing that his representations were
     true when made"), which would support the three-year statute of limitations for fraud.

United States District Court

For the Northern District of California

1    January 1997.  Thus, there was no possible claim under the umbrella policy back in 1987 or 1993.

2    *See Cleveland v. Internet Specialties West, Inc.*, 171 Cal. App. 4th 24, 32 (2009) (noting that "a

3    statute of limitations does not accrue until a cause of action is 'complete with all of its elements,'

4    including injury").  *See, e.g.*, *Roger E. Smith, Inc. v. Shn Consulting Eng'rs & Geologists, Inc.*, 89

5    Cal. App. 4th 638, 650-51 (2001) (stating that "[a] cause of action for professional negligence does

6    not accrue until the plaintiff (1) sustains damage and (2) discovers, or should discover, the

7    negligence"); *Slavin*, 18 Cal. App. 4th at 1540 (stating that "[a] cause of action in tort for

8    professional negligence does not accrue until the plaintiff both (1) sustains damage and (2)

9    discovers, or should discover, the negligence").

10          However, the Court agrees with Allstate that, by early 2002 at the latest, Ms. Fanucci had

11   been injured.  By January 17, 2002, Ms. Fanucci's accident had taken place and she had asserted that

12   the umbrella policy provided for additional UIM coverage in excess of the Fanuccis' auto policy –

13   an assertion squarely rejected by Allstate.  *See* Hovanec Depo., Ex. 4 (computer notes, dated

14   1/18/2002) (indicating that, on January 17, 2002, Allstate informed the Fanuccis that the umbrella

15   policy provided for excess insurance for liability to third parties only); Hinton Depo., Ex. 1 (letter,

16   dated 3/5/2002, from Mr. Barnes to Mr. Alfert) (stating that "Allstate's umbrella policy contains no

17   UM or UIM coverage" and that "it is a liability policy, not a first-party auto policy").  Furthermore,

18   there is no dispute that, by January 17, 2002, Ms. Fanucci believed that her damages exceeded the

19   $250,000 limit of her parents' auto policy, as evidenced by Mr. Hinton's letter of January 16, 2002,

20   stating the Fanuccis' position that they were entitled to more than $1 million.  In short, by January

21   17, 2002, Ms. Fanucci had all the elements to file suit for Allstate's failure to provide the allegedly

22   promised UIM coverage under the umbrella policy.

23          Ms. Fanucci argues, however, that she did not actually suffer damage until December 21,

24   2007 – *i.e.*, when the state appellate court affirmed the trial court's decision limiting her arbitration

25   award to $150,000.  According to Ms. Fanucci, "[u]ntil the appellate court rejected [her] position

26   [that she was entitled to $1 million] and upheld the superior court's reduction of the arbitrator's

27   award to $150,000, [she] had not been damaged by Allstate's failure to secure the additional $1

28

1   million of [UIM] coverage." Opp'n at 8-9.  In support of this position, Ms. Fanucci relies on *Walker*

2   *v. Pacific Indemnity Co.*, 183 Cal. App. 2d 513 (1960).

3          In *Walker*, an individual by the name of Merrill ordered an insurance policy from the

4   defendant-broker covering operation of his logging truck.  *See Walker*, 183 Cal. App. 2d at 514.

5   Merrill actually ordered coverage up to $50,000 but the broker secured a policy with limits of only

6   $15,000.  *See id.*  Thereafter, Merrill was in an accident causing injury to the plaintiff.  The plaintiff

7   sued Merrill and was awarded $100,000 for her injuries.  The insurance company paid the plaintiff

8   $15,000, and Merrill assigned his claim against the defendant to the plaintiff.  The plaintiff then filed

9   suit against the defendant.  *See id.* at 515.  The plaintiff asserted that the defendant had negligently

10  procured insurance coverage of $15,000 rather than $50,000 for Merrill.  *See id.*

11         On appeal, the defendant argued that the plaintiff's claim was barred by the statute of

12  limitations.  According to the defendant, the cause of action accrued in 1952, either when he

13  procured for Merrill the policy having limits of $15,000 instead of $50,000 or when the accident

14  involving Merrill and the plaintiff occurred.  *See id.*  The court disagreed.  It noted that the

15  defendant's wrongdoing – *i.e.*, negligently procuring a policy in the wrong amount – took place in

16  1952 but there was no injury or damage to Merrill at that point.  *See id.* at 516 ("It is true that Merrill

17  then received less than he had ordered [in 1952].  But it is difficult to conceive what action he could

18  then have brought.").  As for once the accident occurred, Merrill had suffered no injury because he

19  knew only that

20              he was exposed to liability in excess of $15,000. . . . Unless he showed
                that his credit rating was adversely affected by the mere existence of
21              the unindemnified liability, or that some other special situation
                imposed present damage, he had not yet suffered a loss which would
22              sustain an action against the [defendant] broker.

23  *Id.*  The court underscored that Merrill's exposure to liability was "a mere possibility that he might

24  suffer liability beyond the indemnity afforded him."  *Id.*  Whether he suffered injury depended on (1)

25  whether liability would be imposed and, if so, (2) "determination of the amount of liability to which

26  the indemnity applied."  *Id.*  The court acknowledged that "it is the uncertainty as to the *fact* of

27  damage, rather than its amount, which negatives the existence of a cause of action.  [But] [i]n the

28

**United States District Court**
For the Northern District of California

1    case at bar, the fact of any damage at all was completely uncertain until judgment in the personal

2    injury action [involving Merrill and the plaintiff]." *Id.* (emphasis added).

3         As indicated by the above discussion, *Walker* does not support Ms. Fanucci's contention that

4    she suffered no injury until the state appellate court decision in December 2007. *Walker* involved

5    potential liability to a third party. There was no action that Merrill, the insured, could bring against

6    the defendant-broker until he was judged to be liable to the plaintiff in the first place. *See id.* at 519

7    ("[E]xposure to and imposition of liability are vastly different matters. Until judgment in the

8    personal injury action, no liability was imposed upon the insured as to which he could allege a cause

9    of action against the broker from whom he had ordered indemnity in excess of that furnished."). In

10   contrast, this case involves a first-party claim by the insured directly against the insurer. The

11   elements for claims of misrepresentation and estoppel were existent and known to Ms. Fanucci by

12   2002. The fact of injury resulting from Allstate's failure to provide the additional UIM coverage

13   was assertable as soon as Ms. Fanucci had a basis for claiming damages in excess of her UIM auto

14   policy limit which should have been covered by the umbrella policy, but which Allstate failed to

15   provide (in 1987 or 1993) and then (in 2002) refused to consider. In short, Ms. Fanucci had grounds

16   to sue Allstate in 2002. Allstate had categorically denied liability under the umbrella policy and

17   thus the dispute was ripe for adjudication. *Cf. Butcher v. Truck Ins. Exch.*, 77 Cal. App. 4th 1442,

18   1469-70 (2000) (stating that, although insurance company agent delivered insurance policy that did

19   not conform with his promise in 1986, "the fact of any damage at all was completely uncertain until

20   [the insurance company] told [plaintiffs-insureds] it would not defend them in the *Hennefer* action

21   [*i.e.*, a lawsuit brought by a third party against the insureds]").

22        Ms. Fanucci argues still that she was effectively prevented from suing Allstate under the

23   umbrella policy because she was obligated to see what would happen first with respect to her UIM

24   claim, which was in arbitration as required by statute. Ms. Fanucci notes that, under the California

25   Insurance Code, the amount of damages suffered as a result of the accident involving the

26   underinsured motorist and claimed under a UIM policy must be arbitrated. *See* Cal. Ins. Code §

27   11580.2(f) (providing that "[t]he policy or an endorsement [for uninsured or underinsured motorist

28   coverage] added thereto shall provide that the determination as to whether the insured shall be

United States District Court

For the Northern District of California

1  legally entitled to recover damages, and if so entitled, the amount thereof, shall be made by

2  agreement between the insured and the insurer or, in the event of disagreement, by arbitration").

3  Ms. Fanucci argues that only if the arbitrator concluded that the amount of damages exceeded

4  $150,000 (the remaining limits under the UIM policy) would she be able to maintain an action

5  against Allstate to recover under the umbrella policy.  If the damages were less than $150,000, any

6  claim related to the failure to provide the umbrella policy coverage would be moot.  The Court does

7  not find this argument convincing because it is the fact of damage, not the amount, that is critical in

8  determining when a claim accrues.  *See Walker*, 183 Cal. App. 2d at 516.  A plaintiff need only

9  reasonably suspect facts supporting damage.  *See Fox*, 35 Cal. 4th at 807 (noting that "[a] plaintiff

10 has reason to discover a cause of action when he or she 'has reason at least to suspect a factual basis

11 for its elements'").  As noted above, by early 2002, Ms. Fanucci had substantial evidence to believe

12 that her damages exceeded $150,000.[6]

13      To be sure, Ms. Fanucci contends that bringing suit in 2002 for misrepresentation and

14 estoppel could have resulted in inefficiency and unnecessary duplication of effort.  As discussed

15 *infra*, there is a substantial likelihood that, in view of the impending arbitration pursuant to the UIM

16 policy, any suit against Allstate on the umbrella limit would have been stayed.  But this does not

17 negate the fact that her claim accrued in 2002.  Instead, this argument has relevance to the issue of

18 equitable tolling, discussed *infra*.

19      2.    Equitable Tolling

20      Ms. Fanucci argues that, even if her claim under the umbrella policy accrued in early 2002,

21 the statute of limitations was equitably tolled while the arbitration and related state court

22 proceedings were pending.  *See* Opp'n at 9.  As noted above, ordinarily, a defendant moving for

23 summary judgment based on an affirmative defense " must establish beyond peradventure *all* of the

24 essential elements of the  . . . defense to warrant judgment in [its] favor."  *Martin*, 353 F.3d at 412

25

26      [6] In this regard, Ms. Fanucci's case against Allstate on the umbrella policy, which was factually conditioned on her ability to prove damages over $150,000 (*i.e.*, in excess of the UIM policy limit), is

27 analogous to an insured making a first-party claim under an insurance policy with a deductible where there is a factual question as to whether the damage exceeds the deductible.  If the insurer rejects

28 coverage, so long as the insured has a reasonable basis for believing that rejection is erroneous and that her damages exceed the deductible, the insured may bring suit.

United States District Court

For the Northern District of California

(emphasis in original).  Where, however -- as here -- a plaintiff contends that the statute of

limitations is not a bar based on equitable tolling, the plaintiff bears the burden of proving the

applicability of such.  *See Judelson v. American Metal Bearing Co.*, 89 Cal. App. 2d 256, 266

(1948) (stating that, when a plaintiff's claim depends upon equitable estoppel, "it must be pleaded in

the complaint with sufficient accuracy to disclose the facts relied upon and the plaintiff must prove

all of the elements constituting it"); *see also United States v. Marolf*, 173 F.3d 1213, 1218 n.3 (9th

Cir. 1999) (noting that "[t]he burden is on [a] plaintiff to show that equitable tolling is appropriate");

*cf. Utility Cost Mgmt. v. Indian Wells Valley Water Dist.*, 26 Cal. 4th 1185, 1198-99 (2001) (stating

that, if a plaintiff raises estoppel to avoid a statute of limitations, then it "must, at the very least,

allege the precise accounting error on which it rests its estoppel argument"); *V.C. v. Los Angeles

Unified Sch. Dist.*, 139 Cal. App. 4th 499, 516 (2006) (noting that "[i]t is plaintiff's burden to

establish facts showing that [the discovery rule is applicable]") (internal quotation marks omitted).

> The equitable tolling of statutes of limitations is a judicially
> created, nonstatutory doctrine.  It is "designed to prevent unjust and
> technical forfeitures of the right to a trial on the merits when the
> purpose of the statute of limitations – timely notice to the defendant of
> the plaintiff's claims – has been satisfied."  Where applicable, the
> doctrine will "suspend or extend a statute of limitations as necessary to
> ensure fundamental practicality and fairness."

*McDonald v. Antelope Valley Community College Dist.*, 45 Cal. 4th 88, 99 (2008).  "Broadly

speaking, the doctrine applies [w]hen an injured person has several legal remedies and, reasonably

and in good faith, pursues one."  *Id.* at 100 (internal quotation marks omitted).

It is clear that, "[w]here exhaustion of an administrative remedy is mandatory prior to filing

suit, equitable tolling is automatic . . . ."  *McDonald*, 45 Cal 4th at 101.  Ms. Fanucci's position is

that she, in effect, meets this standard.  The Court agrees.  Here, there was no administrative remedy

that Ms. Fanucci was required to exhaust before she could file suit,[7] but there was a requirement –

under the California Insurance Code – that she arbitrate her UIM claim.  More specifically, it was

mandatory that she arbitrate her UIM claim to determine (1) whether she was entitled to damages

and (2) if so in what amount.  *See* Cal. Ins. Code § 11580.2(f).  Had Ms. Fanucci initiated the instant

---

[7] There is no evidence that the umbrella policy had an arbitration clause.

1    lawsuit before the arbitration of her damages claim under the UIM policy been completed, this case

2    would have been stayed pending the results of the arbitration.  Proceeding with this case while the

3    arbitration was still pending would have risked inconsistent results since the same issue of the

4    amount of the damages Ms. Fanucci suffered as a result of the auto accident would have been

5    presented in both forums.  Moreover, because of the potential preclusive effect of a verdict here,

6    proceeding with the federal action could have interfered with and undermined the statutorily

7    mandated arbitration.  Thus, completion of the arbitration was, in effect, mandatory before Ms.

8    Fanucci could file this suit.  At least it was sufficiently so to warrant automatic tolling under

9    *McDonald*.

10         Even if completion of the arbitration were not deemed mandatory for purposes of automatic

11   tolling under *McDonald*, the Court would still find tolling appropriate because "equitable tolling

12   may extend even to the voluntary pursuit of alternate remedies."  *Id.*  For example, in *Elkins v.*

13   *Derby*, 12 Cal. 3d 410 (1974), the California Supreme Court concluded that the plaintiff's personal

14   injury action was equitably tolled for the period during which he pursued his workmen's

15   compensation remedy against the defendant.  *See id.* at 412.  The court noted first that there was

16              a line of relatively recent California cases which points toward the
               principle that *regardless of whether the exhaustion of one remedy is a*
17             *prerequisite to the pursuit of another*, if the defendant is not
               prejudiced thereby, the running of the limitations period is tolled
18             "[w]hen an injured person has several legal remedies and, reasonably
               and in good faith, pursues one."

19

20   *Id.* at 414 (emphasis added).  The court also pointed out that the primary purpose of the statute of

21   limitations "is to '[prevent] surprises through the revival of claims that have been allowed to

22   slumber until evidence has been lost, memories have faded, and witnesses have disappeared.'"  *Id.* at

23   417.  "[T]his and other courts as well as legislatures have liberally applied tolling rules or their

24   functional equivalents to situations in which the plaintiff has satisfied the notification purpose of a

25   limitations statute."  *Id.* at 418.  Finally, the court noted that a "duplicative filing requirement might

26   work [an inequity] upon an injured party" and that "duplicative proceedings are surely inefficient,

27   awkward and laborious."  *Id.* at 419-20.

28

United States District Court

For the Northern District of California

Following *Elkins*, the California Supreme Court has stated that, for equitable tolling to apply in a nonmandatory situation, a plaintiff must establish three elements: (1) timely notice to the defendant, (2) lack of prejudice to the defendant, and (3) reasonable and good faith conduct on the part of the plaintiff. *See McDonald*, 45 Cal. 4th at 102.

> The timely notice requirement essentially means that the [plaintiff's] first claim must have been filed within the statutory period. Furthermore[,] the filing of the first claim must alert the defendant in the second claim of the need to begin investigating the facts which form the basis for the second claim. Generally this means that the defendant in the first claim is the same one being sued in the second. The second prerequisite essentially translates to a requirement that the facts of the two claims be identical or at least so similar that the defendant's investigation of the first claim will put him in a position to fairly defend the second. The third prerequisite of good faith and reasonable conduct on the part of the plaintiff is less clearly defined in the cases. But . . . the Supreme Court [has indicated that this factor is met if] the plaintiff filed his second claim a short time after tolling ended.

*Id.* at 102 n.2 (internal quotation marks omitted).

Allowing equitable tolling if the above three factors are satisfied serves

> several important policy considerations. First, it serves the fundamental purpose of the statute of limitations by providing timely notice of claims to defendants, without imposing the costs of forfeiture on plaintiffs. Second, it avoids the hardship of compelling plaintiffs to pursue several duplicative actions simultaneously on the same set of facts. Third, it lessens the costs incurred by courts and other dispute resolution tribunals, because disposition of a case filed in one forum may render proceedings in the second unnecessary or easier and less expensive to resolve.

*Downs v. Department of Water & Power of City of Los Angeles*, 58 Cal. App. 4th 1093, 1100 (1997).

In the instant case, the Court finds that the third factor is satisfied. There is no evidence that Ms. Fanucci has acted in bad faith. *See, e.g.*, *Collier v. City of Pasadena*, 142 Cal. App. 3d 917, 926 (1983) (noting that, "if the plaintiff deliberately misled the defendant into believing the second claim would not be filed, that action might be deemed to constitute bad faith"). Nor is there any evidence that Ms. Fanucci has acted unreasonably. There is no dispute that she made her claim for UIM coverage timely. She participated in the arbitration as required. And she initiated the instant lawsuit less than three months after the state appellate court decision affirming the $150,000 award under

United States District Court

For the Northern District of California

1   the auto policy.[8]  *Compare Structural Steel Fabricators v. City of Orange*, 40 Cal. App. 4th 459, 465

2   (1995) (stating that a "long delay 'even after crediting the tolled period . . . might be considered

3   unreasonable'").

4          Regarding the first factor, there is no contention by Allstate that it was not timely notified of

5   the first claim, *i.e.*, the claim under the auto policy.  The evidence of record also indicates that

6   Allstate was timely notified of the UIM claim.[9]  On the other hand, the filing of the auto policy claim

7   did not alert Allstate of the need to begin investigating the facts which formed the basis of the

8   contract and negligence claims.  In other words, the initiation of the auto policy claim alone should

9   not have caused Allstate to investigate the representations that its agent, Mr. Baldwin, made about

10  the auto policy, let alone the umbrella policy.  Even when the Fanuccis' counsel, Mr. Hinton,

11  asserted in early 2002 that the umbrella policy provided for coverage in excess of the auto policy

12  limits, he did not claim that the umbrella policy provided for such coverage based on representations

13

14

---

15          [8] If Ms. Fanucci's contract and negligence claims accrued in early 2002 and the statute of
16  limitations was tolled during the arbitration and related state court proceedings (*i.e.*, from October 2002
     to December 2007), then Ms. Fanucci still had more than a year after the state appellate court decision
17  to initiate the instant lawsuit for the professional negligence claim (having a two-year statute of
     limitations) – and even more time for the breach of contract and negligent misrepresentation claims
18  (having a four- and three-year statute of limitations respectively). *See Barnett v. Evans*, No. C 06-1093
     CW (PR), 2009 U.S. Dist. LEXIS 30388, at *26 (N.D. Cal. Mar. 24, 2009) (tolling the three-year statute
19  of limitations "for 181 days during the time Plaintiff exhausted his administrative remedies").

20          [9] Ms. Fanucci's accident took place in January 1997.  It appears that, soon after the accident, Ms.
     Fanucci's father contacted Mr. Baldwin, and Mr. Baldwin "indicated that nothing further needed to be
21  done at that time under [the Fanuccis'] insurance policy." Robert Fanucci Depo., Ex. C (letter, dated
     2/11/1998, from Robert Fanucci to Mr. Baldwin).  Robert Fanucci contacted Mr. Baldwin again in
22  February 1998, noting in a letter that,

23                  [a]t this time, we are not aware of the amount of insurance that
                 the driver of the vehicle may have.  In the event that Michelle's injuries
24               exceed the policy limits of the driver's insurance, it is my understanding
                 that the uninsured motorist provisions of our automobile insurance would
25               be applicable to cover any deficiency.

26  Robert Fanucci Depo., Ex. C (letter, dated 2/11/1998, from Robert Fanucci to Mr. Baldwin).  In March
     2001, the Fanuccis' lawyer contacted Mr. Baldwin again, explaining that the underinsured motorist had
27  paid out $100,000 but that this sum did not fully compensate Ms. Fanucci for her injuries and damages.
     The attorney thus asked that "an underinsured claim be opened in this matter if that did not occur at the
28  time of [Robert] Fanucci's prior contacts." Hinton Depo., Ex. 1 (letter, dated 3/7/2001, from Mr. Hinton
     to Mr. Baldwin).

United States District Court

For the Northern District of California

1    that had been made by Allstate's agent.  *See* Hinton Decl., Ex. 1 (letter, dated 1/16/2002, from Mr.

2    Hinton to Mr. Goodman).

3         This omission ties in to the second factor which is more problematic.  The second factor

4    "'essentially translates to a requirement that the facts of the two claims be identical or at least so

5    similar that the defendant's investigation of the first claim will put him in a position to fairly defend

6    the second.'"  *Downs*, 58 Cal. App. 4th at 1100.  *Collier*, 142 Cal. App. 3d at 925 (stating that "[s]o

7    long as the two claims are based on essentially the same set of facts timely investigation of the first

8    claim should put the defendant in position to appropriately defend the second").  In the instant case,

9    there is overlap in some of the facts underlying the auto policy claim and the umbrella policy claim

10   – *e.g.*, the fact that Ms. Fanucci was injured by an underinsured motorist and the damages that she

11   suffered as a result.  On the other hand, as indicated above, the two claims also involve different

12   facts.  With respect to the auto policy claim, any representations made by Mr. Baldwin were not an

13   issue.  In contrast, for the current claims as to the umbrella policy, the representations made by Mr.

14   Baldwin in 1987 are critical – they *are* the case because, in order for Ms. Fanucci to prevail on the

15   umbrella policy claim, she must establish that Mr. Baldwin misrepresented to her father that the

16   umbrella policy provided for UIM coverage.

17        Nonetheless, the Court finds this problem is not fatal to equitable tolling.  The overarching

18   point of the first and second factors is to insure that the defendant is not prejudiced by any delay in

19   filing suit.  *See McDonald*, 45 Cal. 4th at 102.  In the instant case, Allstate has not adequately

20   demonstrated that it has suffered any substantial prejudice as a result of equitable tolling.  As

21   explained above, Ms. Fanucci's claims for breach of contract and negligence did not accrue until

22   early 2002.  Thus, the period from 1987 when the alleged misrepresentation was made to early 2002

23   is not part of the tolling period.[10]  The relevant delay associated with the tolling period, which could

24   have caused prejudice to Allstate, is 2002 (when the claim accrued) to 2005.  This is the period

25

26        [10] Allstate has not, as part of this motion for summary judgment, made any argument that the
     Fanuccis should have raised the issue of coverage under the umbrella policy back in 1997, when they
27   first broached the subject of making an auto policy claim.  Furthermore, it was not actually until 2001
     that any auto policy claim actually needed to be made as it was only then that the Fanuccis learned that
28   the motorist involved in the accident was underinsured.

1   within which the Fanuccis could have but failed to notify Allstate of the misrepresentation claim.

2   But by 2002, witnesses' memories regarding the representations allegedly made by Allstate's agent,

3   Mr. Baldwin, back in 1987 had already become problematic.  The *incremental* delay caused by the

4   three-year delay from 2002 to 2005 is not likely to have made the critical evidence of what was said

5   in 1987 materially more stale.

6        Furthermore, for the reasons stated above, Ms. Fanucci's decision to wait to file suit until

7   after the arbitration and related state court proceedings were completed before initiating the instant

8   lawsuit was reasonable (if not mandatory).  *See McDonald*, 45 Cal. 4th at 100 ("Broadly speaking,

9   the doctrine [of equitable tolling] applies [w]hen an injured person has several legal remedies and,

10  reasonably and in good faith, pursues one.").  The arbitration made the second proceeding – the

11  instant case – "easier and less expensive to resolve" by determining the amount of damages caused

12  by the accident, thus insuring this case was ripe and narrowing its scope.  *Downs*, 58 Cal. App. 4th

13  at 1101; *see also Garabedian v. Skochko*, 232 Cal. App. 3d 836, 843 (1991) (stating that "[t]he

14  object of the 'several remedies' rule is to excuse the plaintiff from the burden of pursuing duplicate

15  and possibly unnecessary procedures in order to enforce the same rights or obtain the same relief").

16       Accordingly, the Court concludes that, as a matter of law, equitable tolling in the instant case

17  is appropriate and therefore Ms. Fanucci's claims are not barred by the statute of limitations.

18  C.   Negligence Claims

19       Allstate argues that, even if Ms. Fanucci's claims are not barred by the statute of limitations,

20  it is still entitled to summary judgment with respect to each of the remaining claims in the action.

21  The Court addresses first Ms. Fanucci's negligence claims.

22       Ms. Fanucci has asserted both a claim for negligence and a claim for negligent

23  misrepresentation.  In the first claim, she alleges that "[Mr.] BALDWIN negligently failed to secure

24  umbrella or excess [UIM] coverage even though Robert Fanucci demanded umbrella limits which

25  matched his underlying ALLSTATE primary auto coverages."  Compl. ¶ 41.  In the second claim,

26  she alleges that Mr. Baldwin negligently misrepresented that the "umbrella policy applied to [UIM]

27  coverage."  Compl. ¶ 44.

28

United States District Court

For the Northern District of California

1    Ms. Fanucci's allegations are supported by evidence, in particular, the deposition testimony

2  of her father, Robert Fanucci. *See, e.g.*, Robert Fanucci Depo. at 57-58 ("I specifically advised [Mr.

3  Baldwin] that I – that I wanted a personal umbrella policy, and that I wanted a million dollars – that

4  I thought a million dollars of coverage was – would be adequate for – for liability uninsured motorist

5  and homeowners.  And he agreed to that. . . . [¶] And he basically then told – you know, said this is

6  how, you know, we do it.  We went down a list of all the coverages.  [¶] And he said, this is what

7  you – what you need to have the umbrella apply.").  Therefore, it appears that there is a genuine

8  dispute of material fact on the negligence claims that would preclude summary judgment.

9    Defendants argue, however, that, as a matter of law, the claims cannot succeed because there

10  was no justifiable reliance by the Fanuccis – *i.e.*, because the umbrella policy on its face clearly

11  excluded coverage for damage to any insured.  *See Conroy v. Regents of University of Cal.*, 45 Cal.

12  4th 1244, 1255 (2009) (noting that one of the elements of fraud is justifiable reliance).  There is

13  some authority to support Defendants' position.  For example, in *Hadland v. NN Investors Life*

14  *Insurance Co.*, 24 Cal. App. 4th 1578 (1994), the plaintiffs obtained a health insurance policy based

15  on an agent's representation that it was "'as good if not better'" than their old policy and at half the

16  premium cost.  *Id.* at 1581.  As it turned out, the new policy, although half as expensive as the old

17  policy, provided significantly less coverage.  *See id.* (noting that the new policy did not cover most

18  outpatient medical expenses).  The plaintiffs subsequently brought a fraud claim against, *inter alia*,

19  the insurance company.  On appeal, the court stated: "To take their fraud cause of action to the jury,

20  the [plaintiffs] had to prove not only defendants' false representations, but their own justifiable

21  reliance." *Id.* at 1586.  Although justifiable reliance is ordinarily a question of fact for the jury, *see*

22  *id.*, the plaintiffs, "having failed to read the policy and having accepted it without objection, cannot

23  be heard to complain it was not what they expected.  Their reliance on representations about what

24  they were getting for their money was unjustified as a matter of law." *Id.* at 1589.

25    *Hadland*, however, is a questionable decision.  The court in *Hadland* relied in large part on

26  *Hackethal v. National Casualty Co.*, 189 Cal. App. 3d 1102 (1987).  In *Hackethal*, however, the

27  court found there was no justifiable reliance because the agent did not say anything misleading to

28  the insured.  *See id.* at 1107, 1111 (noting that, as admitted by plaintiff, agent made representations

20

United States District Court

For the Northern District of California

1  about coverage for lawsuits but made no representations about coverage for hearings before

2  administrative agencies with the power to discipline doctors).[11]  *See Butcher*, 77 Cal. App. 4th at

3  1464 (distinguishing *Hackethal* because "the insured there was not misled by the agent or the

4  insurer").

5      Moreover, *Hadland* is not dispositive because there is contrary case law, most notably,

6  *Clement v. Smith*, 16 Cal. App. 4th 39, 45 (1993), and *Paper Savers, Inc. v. Nacsa*, 51 Cal. App. 4th

7  1090 (1996).  In *Clement*, the court rejected the argument that an insured can never reasonably rely

8  on an insurance agent's representations as to coverage.  It explained:

9           When dealing with a contract as adhesive as the typical
          insurance policy, we are unwilling to impose on the insured so
10          onerous a burden as would *automatically* defeat any agent's liability
          for misrepresentation. Certainly an insured cannot remain intentionally
11          ignorant of the terms of his or her policy.  Here, however, we have a
          factual finding by the trial court that [the plaintiff] reasonably relied
12          on [the agent's] representation of coverage.  That finding is supported
          by substantial evidence where the record shows [the agent's]
13          representations were in no way cautionary or equivocal.  Absent some
          notice or warning, an insured should be able to rely on an agent's
14          representations of coverage without independently verifying the
          accuracy of those representations by examining the relevant policy
15          provisions.  This is particularly true in view of the understandable
          reluctance of an insured to commence a study of the policy terms
16          where even the courts have recognized that few if any terms of an
          insurance policy can be clearly and completely understood by persons
17          untrained in insurance law.

18  *Clement*, 16 Cal. App. 4th at 45 (emphasis added).

19      In *Paper Savers*, the court concluded that there were triable issues of fact precluding

20  summary judgment as to whether the insurance company's agent made certain representations about

21  _____

22      [11] The exact language in *Hackethal* on unjustifiable reliance is as follows:

23          *Dr. Hackethal admitted the Nettleship agent never told him the policy
          provided coverage for administrative hearings like that before which he
          was required to appear by BMQA.*  Given the particular circumstances
24          of this case, when Dr. Hackethal renewed the National policy for the
          1976/1977 term, we cannot see how anything the agent said nine years
25          earlier would have caused him to reasonably believe that his contract
          covered hearings like those before BMQA.  If he did rely on the
26          statements of the Nettleship agent in forming such belief, and for that
          reason renewed the policy, his reliance was unjustifiable as a matter of
27          law.

28  *Hackethal*, 189 Cal. App. 3d at 1111 (emphasis added).

1    coverage to the plaintiff "and thereby assumed a special duty to [the plaintiff] to ensure it had the

2    coverage it thought it had purchased." *Paper Savers*, 51 Cal. App. 4th at 1095.  Notably, in arriving

3    at this conclusion, the court rejected the insurers' argument that "an insured is presumed to have

4    read and understood his insurance policy and, assuming the policy language is clear, an agent's

5    misleading comments are irrelevant." *Id.* at 1101.

> Essentially the issue whether an insured has a duty to read his policy
> and whether in not reading his policy he is, nonetheless, bound by its
> terms, is a complex one and not one that can be stated baldly *without
> an analysis of the surrounding facts*.  In the instant case the same
> disputed facts return to the forefront to dispose of this issue.  *If [the
> agent] held himself out as an adviser to [the plaintiff] and interpreted
> the coverage in a way different from what the language of the policy
> indicated*, [the plaintiff] is simply saying that [the agent] may be liable
> for his negligence, if proved.  In this, he is correct.

11   *Id.* at 1104.

12       Allstate argues that, even if there is a fact-based inquiry as to whether reliance was

13   reasonable in spite of clear policy language to the contrary, they should be entitled to summary

14   judgment because no reasonable jury could find in Ms. Fanucci's favor based on the evidence

15   submitted – namely, the sophistication of Robert Fanucci, an attorney with experience in financial

16   planning (including insurance needs), the clear language of the policy (only eleven pages long), and

17   the clear language used in the declarations page.  *See Omni*, 2008 U.S. Dist. LEXIS 85581, at *11

18   (in deciding whether there was reasonable reliance on an agent's misrepresentation, taking into

19   account the following factors: "the sophistication of the mislead party, the specificity of the written

20   language, and the clarity and length of the relevant documents").  This evidence is persuasive and

21   weighs significantly against Ms. Fanucci's case.  However, it is not the only evidence of record.

22   *Paper Savers* underscores that the nature of the interaction between the agent and insured must be

23   considered.  *See Paper Savers*, 51 Cal. App. 4th at 1104 (noting that "the extent of an insurance

24   agent's duty depends on the nature of the interaction between the agent and the insured and the

25   representations the agent made regarding coverage when discussing the policy").  Accepting Ms.

26   Fanucci's version of the facts, which the Court must do as Allstate is the party moving for summary

27   judgment, a reasonable jury might conclude that, in spite of Robert Fanucci's sophistication and the

28   clarity of the policy and declarations page, the interaction between Mr. Baldwin and Robert Fanucci

United States District Court
For the Northern District of California

1  was such[12] that it was reasonable for the latter to rely on the former's representations.  *See, e.g.*,

2  *Butcher*, 77 Cal. App. 4th at 1463-64 (emphasizing the specific interaction between the insured and

3  the insurance agent – *i.e.*, that the insured had specifically asked the agent to duplicate his coverage

4  and that the agent misled the insured into thinking he had done so; thus, concluding that there was a

5  triable issue of fact precluding summary judgment).

6  D.    Breach-of-Contract Claim

7        In her complaint, Ms. Fanucci alleges that Allstate should be equitably estopped from

8  denying UIM coverage of $1 million under the umbrella policy based on the representations made

9  by Mr. Baldwin.  *See* Compl. ¶ 31.  In the alternative, she "alleges that the contract should be

10  reformed to be consistent with the mutual intentions of [Mr.] BALDWIN and [her father] Robert

11  [Fanucci] – to wit, that the umbrella policy would provide [UIM] coverage."  Compl. ¶ 31.  Allstate

12  challenges both theories in its motion for summary judgment.

13        1.    Estoppel

14        As to the first theory, Allstate argues that it must be rejected because, as a matter of law,

15  "'estoppel cannot be used to create coverage under an insurance policy where such coverage did not

16  originally exist.'"  Mot. at 11-12 (quoting *Miller v. Elite Ins. Co.*, 100 Cal. App. 3d 739, 755 (1988);

17  also citing *Manneck v. Lawyers Title Ins. Corp.*, 28 Cal. App. 4th 1294, 1303 (1994)).  The Court

18  does not agree.  In *Granco Steel, Inc. v. Workmen's Compensation Appeals Bd.*, 68 Cal. 2d 191

19  (1968), the California Supreme Court noted that, "in some circumstances the acts of an insurer or its

20  agent *prior* to an oral agreement will be sufficient to estop the insurer from denying coverage."  *Id.*

21  at 199.  The court ultimately held that the insurer in the case under consideration was estopped from

22  denying coverage based on its agent's representation that coverage would be provided upon

23  insured's request (which was done).  *See id.* at 203-05; *see also* Rutter Group, Cal. Prac. Guide Ins.

24  Litig. ¶ 2:45 ("Some cases suggest the insurer may be bound by the agent's representations under the

25

26  _____

        [12] *See* Robert Fanucci Depo. at 57-58 ("I specifically advised [Mr. Baldwin] that I – that I
27  wanted a personal umbrella policy, and that I wanted a million dollars – that I thought a million dollars
   of coverage was – would be adequate for – for liability uninsured motorist and homeowners.  And he
28  agreed to that. . . . [¶] And he basically then told – you know, said this is how, you know, we do it.  We
   went down a list of all the coverages.  [¶] And he said, this is what you – what you need to have the
   umbrella apply.")

United States District Court

For the Northern District of California

1  doctrine of estoppel: '(F)raud or misrepresentation as to coverage under a policy or issuance of a

2  policy different from that represented to the insured estops the insurer from reliance on the coverage

3  as stated in the issued policy.'").

4       The Court acknowledges the case law cited by Allstate but finds such law in tension with

5  *Granco*.  Moreover, the main cases cited by Allstate, *Miller* and *Manneck*, are problematic.  *Miller*

6  and *Manneck* rely on *Aetna Casualty & Surety Co. v. Richmond*, 76 Cal. App. 3d 645 (1977).  In

7  *Aetna*, the court did state that "[t]he rule is well established that the doctrines of implied waiver and

8  of estoppel, based upon the conduct or action of the insurer, are not available to bring within the

9  coverage of a policy risks not covered by its terms, or risks expressly excluded therefrom," *id.* at

10  653.  However, the court actually seemed to reject the estoppel and waiver arguments made by the

11  insured on their merits, *see id.* at 652-53, and thus the *Aetna* language appears to be dicta.

12       Furthermore, the *Aetna* court relied on the American Jurisprudence treatise to support the

13  above statement.  *See id.* at 653 (citing 29A Am. Jur., Ins. § 1135).  That treatise, while it takes note

14  of the general rule, also makes note of an exception to that rule:

15           There are some cases that support the view, either expressly or
       by implication, that an insurer may waive or be estopped from
16       asserting particular policy provisions even though the effect may be to
       bring within the coverage of the policy risks not covered by its terms,
17       or expressly excluded therefrom.  Specifically, promissory estoppel
       may create insurance coverage where to refuse to do so would
18       sanction fraud or other injustice.  Thus, for example, where an insurer
       or its agent misrepresents, even though innocently, the coverage of the
19       insurance contract, or exclusions therefrom, to the insured before or at
       the inception of the contract, and the insured reasonably relies
20       thereupon to his or her ultimate detriment, the insurer is estopped to
       deny coverage after a loss or a risk from a peril actually not covered
21       by the terms of the policy.  The fact that the insured has not read the
       insurance policy "word for word" is not, as a matter of law, an
22       absolute bar to his or her theory of estoppel.

23  43 Am. Jur. 2d, Ins. § 481; *see also* 44A Am. Jur. 2d, Ins. § 1548 (noting the same).

24       Finally, it is notable that Ms. Fanucci has cited at least one California case that, contrary to

25  *Miller* and *Manneck*, acknowledges the validity of an estoppel theory based on fraud.  *See Hartford*

26  *Fire Ins. Co. v. Spartan Realty Int'l, Inc.*, 196 Cal. App. 3d 1320, 1325 (1987) (stating that

27  "California has long followed the . . . rule that fraud or misrepresentation as to coverage under a

28  policy or issuance of a policy different in coverage from that represented to the insured estops the

United States District Court

For the Northern District of California

1   insurer from reliance on the coverage as stated in the issued policy"); *see also Westoil Terminals*

2   *Co., Inc. v. Industrial Indem. Co.*, 110 Cal. App. 4th 139, 152 (2003) (stating that "[a]n insurer may

3   be estopped to deny that coverage exists") (internal quotation marks omitted).  Allstate tries to

4   distinguish *Hartford* on the basis that "estoppel may prevent an insurer from asserting a policy

5   exclusion or condition," but "Allstate is not relying on an exclusion [here]."  Reply at 12.  This

6   argument is not convincing for two reasons.  First, Allstate does appear to be relying at least in part

7   on an exclusion.  The umbrella policy at issue states that "Allstate will pay damages which an

8   insured person becomes legally obligated to pay, because of bodily injury, personal injury or

9   property damage, subject to the terms, conditions and limits of this policy.  Bodily injury, personal

10  injury and property damage must arise from a covered occurrence."  Davis Decl., Ex. A (Umbrella

11  Policy at 4).  A covered occurrence includes an occurrence arising out of "[p]ersonal activities of an

12  insured person."  Sisson Decl., Ex. A (Umbrella Policy at 4).  However, there is a specific exclusion

13  for "any occurrence arising out of bodily injury or personal injury to an insured person."  Sisson

14  Decl., Ex. A (Umbrella Policy at 5).  More fundamentally, even if Allstate were not relying on an

15  exclusion, it has not cited to any cases that expressly limits estoppel to cases involving exclusions

16  only.  It is difficult to discern any logical basis for such a distinction.

17          Finally, Allstate contends that *Watson v. United States Fid. & Guar. Co.*, 427 F.2d 1355 (9th

18  Cir. 1970), supports its position.  Ms. Fanucci, in turn, asserts that *Watson* is distinguishable

19  because, there, "the issue was whether the policy covered the risk" whereas

20              the only dispute here is the limits applicable to a covered risk.  Here
                coverage for the [UIM] risk existed, but not in the amount Robert
21              Fanucci requested.  Assuming that the trier of fact accepts Mr.
                Fanucci's testimony that he was promised $1,250,000 of [UIM]
22              coverage but received on $250,000, estoppel can be applied as an
                equitable remedy, since such a finding would not extend the policy to
23              an uncovered risk.

24  Opp'n at 15-16.  Ms. Fanucci's distinction is not persuasive; the issue here is not the extent of the

25  UIM coverage under the umbrella policy but whether the umbrella policy – a separate insurance

26  policy – provides for UIM coverage in the first place.  That being said, *Watson* is nonetheless

27  distinguishable.  In *Watson*, there does appear to have been any affirmative misrepresentation by the

28  insurance agent which would justify an estoppel.  *See Watson*, 427 F.2d at 1357 (noting that, "[t]o

United States District Court

For the Northern District of California

1  justify application of the doctrine of equitable estoppel, 'there must be conduct – acts, language or

2  silence amounting to a representation or concealment of material facts'" but that here "[d]efendant

3  did not misrepresent the nature of the coverage under the policy").

4        In sum, the Court rejects Allstate's motion for summary judgment on the estoppel theory.

5        2.   <u>Reformation</u>

6        As a preliminary matter, the Court notes that, in her complaint, Ms. Fanucci contends that the

7  terms of the umbrella policy should be reformed because of a mutual mistake made by the parties,

8  *see* Compl. ¶ 31 ("alleg[ing] that the contract should be reformed to be consistent with the *mutual*

9  *intentions of BALDWIN and Robert* – to wit, that the umbrella policy would provide underinsured

10  and uninsured motorist coverage") (emphasis added), and not because of a unilateral mistake.  *See*

11  Cal. Civ. Code § 3399 (providing that a contract may be revised "[w]hen, through fraud or a mutual

12  mistake of the parties, or a mistake of one party, which the other at the time knew or suspected, a

13  written contract does not truly express the intention of the parties"); *Burdick v. Union Sec. Ins. Co.*,

14  No. CV 07-4028 ABC (JCx), 2009 U.S. Dist. LEXIS 35611, at *30 (C.D. Cal. Apr. 2, 2009) (noting

15  that reformation is available based on "(1) fraud, (2) mutual mistake, or (3) the mistake of one

16  party"; adding that some courts have found reformation available based on a negligent

17  misrepresentation).  Because the only basis for reformation pled in the complaint is mutual mistake,

18  and Ms. Fanucci, as reflected in her opposition, now appears to disavow such a theory, *see* Opp'n at

19  16 (focusing on unilateral mistake), Allstate is entitled to partial summary judgment on that part of

20  the contract claim.[13]

21        To the extent Ms. Fanucci now relies on a theory of unilateral mistake to support her

22  reformation-based contract claim, as reflected in her opposition, the Court also finds that Allstate is

23  entitled to partial summary judgment.[14]

24

25

---

26       [13] Furthermore, Ms. Fanucci has presented no evidence of a mutual mistake.  There is no

27  evidence that Allstate believed the umbrella policy provided coverage for first-party UIM claims.

     [14] Allstate has not made any contention that it was not put on sufficient notice of the unilateral

28  mistake theory.

**United States District Court**
For the Northern District of California

1    A unilateral mistake by one party may be the basis of a reformation only when the other

2  party, at the time, knew of or suspected the mistake.  *See* Cal. Civ. Code § 3399.  In the instant case,

3  Ms. Fanucci's position is that her father made a mistake in 1987 about the coverage available under

4  the umbrella policy and that Mr. Baldwin, Allstate's agent, knew about the mistake at the time

5  because he represented to her father during their 1987 meeting that the umbrella policy would

6  provide coverage for a UIM claim.  The problem for Ms. Fanucci is that, based on the undisputed

7  evidence of record, no umbrella policy actually existed until 1993.  In other words, some six years

8  had passed with the Fanuccis making payment on the auto policy only (not any umbrella policy) and

9  without the Fanuccis ever questioning why they had not received a copy of the umbrella policy.

10  From Allstate's perspective, whatever the reason, no umbrella policy was in place for six years.  Ms.

11  Fanucci has presented no evidence of any further communication between Mr. Fanucci and Mr.

12  Baldwin or Allstate about the umbrella policy or its scope occurring after 1987.  Nothing in the

13  record suggests Allstate had reason to believe that Mr. Fanucci was still acting under a mistake

14  when the policy was finally put in place in 1993, six years after the alleged misrepresentation by Mr.

15  Baldwin.  Given this gap in time and the lack of any evidence on point, no such inference can

16  reasonably be drawn.  Hence, all the requisite elements of reformation based on unilateral mistake

17  are not present.

18    Accordingly, the Court grants Allstate's motion for partial summary judgment on the

19  contract claim to the extent it is based on a reformation theory.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**III.   <u>CONCLUSION</u>**

For the foregoing reasons, the Court grants in part and denies in part Allstate's motion for summary judgment.  The case shall proceed to trial on both negligence claims as well as the claim for breach of contract based on an estoppel theory.  The claim for breach of contract based on a reformation theory is dismissed.

This order disposes of Docket No. 48.


IT IS SO ORDERED.


Dated:  June 30, 2009

_____
EDWARD M. CHEN
United States Magistrate Judge

**United States District Court**
For the Northern District of California